All right, I think we're good to go. All right, Mr Rosenberg, you're up first. Good morning, Your Honor. The district court appears to be in a time warp for the past nine years. The jail population, and we're talking about the jail in Orleans Parish, of course, decreased from over 2,600 inmates to less than 800 inmates. It is only being partially used. The new jail, which was built in just 2015 to the tune of $150 million, is only being partially used because of that decrease in the number of inmates. And I know Your Honors recognize that the expansion of jail facilities and the increased incarceration of individuals are just anathema to national policies, period. Now, the district court conveniently omitted the numerous times the Prison Litigation Reform Act was mentioned. Mr. Rosenberg Yes, Your Honor. I noted in your brief you refer to a, quote, unelected federal district judge. That's district court judge. That's popular among persons who want to attack the federal judiciary. Frankly, I'm surprised you used it in the light of your background. But now you're talking about the district court conveniently. How about leaving out the pejorative statements and just argue the facts? Mr. Rosenberg Your Honor, I was going to use the same term. I didn't mean to be pejorative to the district judge, and I apologize to Your Honor and the court, and I apologize to the district judge. That was not my intention, Your Honor. Mr. Davis What was your intention? Mr. Rosenberg My intention was, Your Honor, to create the and to underscore the dichotomy between an appointed judge and the elected judges in the state judiciary who are responsible to the taxpayers under the Prison Litigation Reform Act. That was my intention. Mr. Davis It's still hard to see how they get you anywhere. My point is going to be you got 9 minutes and 40 seconds, which under the best orders is hard to get a lot done in. I would suggest you go to the juggler, whatever it is you think is convincing. We read the tons of material in here. We know this is not a divorce case. We're clear on what everybody has said. So go to the juggler on the issues, because when your time's up, I'm going to stop you. Mr. Rosenberg Thank you, Your Honor. I'm going to try to speak quickly, but I wanted to clarify that issue with Judge Marksdale. Mr. Davis I got you. As he said, let's go to what? There's a lot going on here. We've read it all. We know who the participants are, who ruled what, the jail population, what it was. It diminished down, pierced some of what's written, took that into account. So we got this heavy duty, so let's go to the core arguments. Mr. Rosenberg I'm going to go right to the core, Your Honor, if you allow me. Mr. Davis Yeah. Mr. Rosenberg We're going to start with the construction of a new jail in January, in its January 2019 order, and again in its March 2019 order. And the record sites are, of course, in our brief, Your Honors. The fact is that under the PLRA, which Your Honors reviewed de novo, the district court orders exceeded what was necessary for even an arguable constitutional issue or even an arguable constitutional infraction. It was not the least intrusive approach. It was not the most narrowly tailored approach. It did not defer to the local officials. Mr. Davis Yet the city agreed to it.  Mr. Rosenberg The city agreed to the, if Your Honor is referring to the stipulated order, the city agreed to that stipulated order, but the city, but there's nothing in that order, Your Honor, that refers to the construction of Phase 3 at all. It's just appropriate housing that's mentioned there. Now, my opponents, of course, excuse me, my opponents want to say that is Phase 3. That's the way that the lower court interpreted it, but there's absolutely, when you do a straight reading of those orders, nothing that says Phase 3 must be built. Another jail complex need not be built. Now, most importantly, under the Prison Litigation Reform Act, the court must defer and it must give substantial weight to public safety, but yet the lower courts gave no acknowledgement of public safety at all. In fact, they said just the opposite. They refused to consider public safety issues relating to non-incarcerated individuals. Now, the plaintiffs and DOJ and the sheriff all want to allude to those two orders, Judge Barksdale, that you mentioned a moment ago, but there's nothing in either one of those And frankly, equally as important, those orders did not comply with either the Louisiana Constitution or our Home Rule Charter, and amicus is going to identify and address those critical issues for the court during its limited time this morning. But the city is attempting to get relief from the district court orders that directed the construction of a new jail complex, and as a Supreme Court in RUFO, I heard Judge Stewart ask, what's your best case? I would point to respectfully RUFO by the Supreme Court saying the district courts, federal district courts should defer to the local administrators and elected officials to make those types of decisions, and Judge Stewart, if you allow me, because I know you said give me your best case, I would say the other issue which I'm about to address, it would be the Ruiz versus U.S. case, which you and Judge Dennis sat on the panel of, were members of that panel, and said you've got to provide detailed analysis why you are not adhering to the criteria of the Prison Litigation Reform Act. Well, let me ask you this. It's a lot of reading. I read it a long time ago. But it looks, I mean, Judge North has his lengthy memorandum. It looks like the PLRA, which is what you're leading off once past the other stuff, was never even raised until the reply brief way back when. I mean, it wasn't up front, you know, like, okay, what's your best case, what's your strongest argument? This comes in as an afterthought even below about the PLRA. Now, it's, you know, the front and center is this is what the court is violating the PLRA. You can't construct a jail. An argument can be made, you know, there was a consent judgment. The argument is made as if the judge just pulled this out of the sky. So I guess the question first is, you know the rules about waiving stuff, and so how is it that the PLRA doesn't even get raised until a reply brief way down below? I mean, you know, make an argument about waiver, but even assuming it's still kind of there, it sure didn't seem like it had as much vitality as you want to give to it if it was an afterthought to somebody to even raise it. Judge Stewart, I hear the question, and obviously I expected it. It was certainly not an afterthought. It was the timing of various attorneys' entry into the proceedings on behalf of the city. It's been on the books since forever. Your Honor, that's exactly like a case that just came out. I didn't mean to speak over you, Your Honor, but the fact is exactly that. The PLRA has been cited by the parties, has been cited by the parties. It was not a new concept, but first of all, besides being referenced, it was even briefed extensively. The magistrate judge, as Your Honor just pointed out, gave not only the parties, but gave a non-party, not one, not two, not three, but four opportunities to brief the PLRA, and that is exactly what this Court has said in Liljenburg and in Bradley that if they have an opportunity to respond, then there is not a waiver. The PLRA, as we're talking about, is this idea that a federal judge is barred by the PLRA from ordering construction of a prison. That was a new point that was raised in the reply. There are a lot of nuances to the PLRA in this case, but this idea that a federal judge cannot do that, even though the consent decree was on the books, is a brand new point. Well, Your Honor, with due respect, the prohibition of a federal judge ordering the construction of a jail is set forth in the PLRA itself. But the point is, it was raised so late in this proceeding. This started in 2013, the first instance, and here we are in 2022, and there are things such as judicial estoppel and all sorts of other theories that would just blow out of the water even being able to raise that point at this late date. Otherwise, we just go through this endless round of new lawyers, new sheriffs, new mayors, et cetera, et cetera, and dragging out the implementation of a consent decree. Yes, Judge Barksdale, and I understand that. But this court has said specifically that if the district court has enough information and enough time to assess those arguments, and that's exactly what the district court as well as the magistrate judge did, then there is not a waiver. And the issue actually can be raised, as this court has acknowledged for the first time on appeal, if it's purely a legal issue. And that's exactly what is presented to this court. It's not Johnny-come-lately. Well, but it's a new legal issue under the guise of when we're dealing with a consent decree. This isn't the normal first time at bat. We've got a consent decree here. All right, Mr. Clerk, I'm going to make a rare exception. Give Mr. Rosenberg two minutes, only because I took him off for 30 seconds on my point. So I'm going to give him two minutes so he can regroup and give us his full throated . . . I appreciate that courtesy, Judge Stewart. All right, go for it. I'm sorry? No, I'm just saying go. Okay, I'm going. I'm trying to get out of the gate, Judge Stewart. I wanted to address the fact that the district court did no analysis of the PLRA, none, which warranted a remand. There's no ability to analyze what the district court did or did not do without an analysis that was required by this court in Ruiz v. United States. He repeatedly, in all his orders, says, I find that this is, and he tracks the language of the PLRA, the least intrusive method, etc., etc., etc. Your Honor, Judge Parksville, I'm sorry to interrupt you, but I'm cognizant of the time, and I apologize for interrupting you, but frankly, that is exactly what was stated in those two orders in United States, that you cannot rotely parrot the language, that conclusory language in the PLRA. It's insufficient. You've got to have an analysis. Well, there was an analysis preceding that. All sorts of facts are stated in these myriad orders. Well, Your Honor, we're only dealing with those two orders and that hearing, and there was no analysis given by the district court in his affirmation of the magistrate judge. Well, he incorporated the magistrate judge's ruling. The magistrate judge went on and on and on about all of these problems. I can't question that he went on and on, Judge Parksville, but there still lacked an analysis. What's your best . . . Judge Stewart, I see my lanyard is over. All right, but you get to answer my question on the red light. What's your best case that construes the PLRA language about not constructing a jail, but in the context of where there is an existing consent decree signed off by parties? You got a case? What's the best one? Not an argument. I just want a case. The argument would be the Supreme Court case in Rufo as well as the Supreme Court case in Hoyle. All right. Very succinctly done. Thank you, sir. Thank you for your courtesy. All right. All right, Mr. Forrest, you're here on behalf of Ms. Hudson, the sheriff to be, I take it? That's correct, Your Honor. Counsel, what basis does an unelected . . . I'm sorry, does a person who has been elected to an office but does not even hold that office? I understand the new sheriff takes office on the 2nd of May. How on earth does that person have standing to come before this court other than the fact we've allowed her to urge, to argue on a case? Your Honor, I think as an amicus, the sheriff-elect has a significant interest in the proceedings before the court today and obviously whatever ruling the court makes with respect to the issues that are on appeal. Well, an amicus is not to come in and make new arguments. An amicus, we don't even consider arguments raised by an amicus if there aren't the arguments raised by other parties. But here we have a person who isn't even in office coming in to urge positions because of her position she will assume on the 2nd of May. That's because she is the exact person who will have to live with and implement and deal with whatever this court holds. As you noted, Your Honor . . . But she's arguing as a party. She's not arguing as an amicus. Amicus means friend of court. That's right, Your Honor. She's arguing in essence as a party. Well, Your Honor, she's arguing as someone who will have to deal with and implement and work with whatever this court holds. So she certainly has an interest with respect to the result of this appeal and the arguments that she's raised. Amica, I don't have an interest in that sense. It's just coming in as a new . . . because this sheriff that will assume office doesn't like what the sheriff that is in office has been doing. Your Honor, on the general point of what an amicus does, there are situations where amici have a direct interest in the court's potential holding based upon other cases in which they may be involved or . . . Of course they do. Right. But . . . well, just go ahead with your argument. And, Your Honor, the issues that we intend to address today go specifically to implications of the court's order and as they relate to Louisiana law. And I think that the arguments we've made are ones that an amicus would ordinarily raise. And in particular, we suggest that the court should overrule the district court's order because it violates the Louisiana Constitution and the city's constitutionally protected home rule charter. The district court based its opinion in large part upon . . . I don't think the Louisiana Constitution or the home rule or the charter allows for unconstitutional prison conditions to you. You don't think that trumps conditions in a prison that have been, by the consent decree, considered unconstitutional? I don't think it trumps it, but they're not mutually exclusive, Your Honor. And there was discussion earlier regarding the PLRA. The PLRA in Section 3626A1B specifically addresses the interplay between federal constitutional law and state law. And there's been no demonstration here that there's a need to circumvent state law or to require state officials to exceed their authority under state or local law to ensure that the constitutional rights of the inmates are protected. The sheriff-elect is committed to complying with the consent judgment, but she believes that the retrofit plan is a superior alternative for addressing the mental health needs of the inmates. So there are different ways in which the consent judgment can be accomplished. I'll let you finish the sentence. There are different ways in which the consent judgment can be complied with, but the consent judgment itself doesn't mandate the Phase III jail. And therefore, our argument is that the district court should have observed Louisiana law in reaching the conclusions that it ultimately reached and allowing the parties to properly implement the consent judgment. All right. Thank you. Thank you, Your Honor. All right. We'll hear from the other side. Ms. Cummings? Good morning. May it please the court, my name is Elizabeth Cummings on behalf of the plaintiffs' appellees. This case is about the city of New Orleans' Rule 60 motion to modify two non-final procedural court orders from 2019. To understand these orders, a brief procedural history is useful. In 2016, the plaintiffs, joined by the city, moved for noncompliance with the consent judgment. That motion was resolved by a negotiated agreement, the 2016 stipulated order, agreed to by all of the parties. Through that 2016 agreement, after years of stalemate over how to safely house and care for Orleans jail detainees with medical and mental health needs, the city and sheriff committed to finalize a plan to solve this problem once and for all. In January 2017, in accordance with that 2016 agreement, the independent compliance director provided the district court with a plan largely authored by a city employee that called for construction of Phase 3, among other things. In 2019, the termination of an agreement with the Department of Corrections demanded urgent completion of Phase 3. Both of the 2019 orders the city seeks to modify were simply procedural efforts to move the parties along in the completion of their plan. The city never challenged those orders, rather it continued moving forward. Only after the city unilaterally and without notice stopped work on Phase 3 in June 2020 did the city file its Rule 60 motion. Because of the non-final and procedural nature of the 2019 orders the city seeks to modify, this court does not have appellate jurisdiction. But if this court finds jurisdiction, the district court's denial of the motion, deeply rooted in an extensive record of evidence, should not be overturned on abuse of discretion. The city made a strategic choice to only seek modification of these non-final procedural orders. The city has sought to establish jurisdiction on three different inconsistent theories. I will only address the first two under 28 USC 1292A1, related to interlocutory orders relating to injunctions, and then secondly 1291, this court's jurisdiction to review final appeals. The 2019 orders are not injunctive. The district court did not consider or rule on this unpresented argument as to whether or not these orders were injunctive in nature when it denied the city's Rule 60 motion to modify final orders. The city never suggested that these orders were injunctive until its reply on the motion for stay. That motion for stay has been denied by the district court and it has been denied by this court on November 16th, 2020. The 2019 orders were not the result of any party moving for injunctive relief or any hearing, and the district court never expressed any intention or gave any notice to any of the parties that these orders would be considered or should be considered injunctive. The orders do not include any specific actions for the city to take by a specific deadline for the construction of Phase 3, all of which would be required for these orders to be considered injunctive under Rule 65. General Counsel, I suggest you're wasting a lot of your time on the jurisdictional argument. It's interesting the United States says there is jurisdiction for this appeal, so you've used up a good amount of your time. Yes, Your Honor. Briefly, I would just also suggest that these orders are not final because they did not conclusively or finally dispose of any question of law or fact. There is still much work for both the parties and the court to do. What we do have is an undisputed factual finding from the district court that the city is really seeking relief from its own commitment and that the district court found and pointed to evidence that the city had already committed to and was taking steps towards the construction of Phase 3 when the 2019 orders were issued. The district court was relying on the city's legally designated representative, specifically then-City Attorney Dietz's commitment in open court in June 2017 outlining steps that the city had already taken and steps that the city planned to take in completion of the three capital projects outlined in the January 2017 plan. The district court cataloged significant evidence including the current administration's commitments to build Phase 3 to the district court and a letter from the director of capital projects, Vince Smith, in 2018. Additionally, the district court pointed to the 14 times that the city committed to and outlined progress towards completion of Phase 3 after the 2019 orders were entered. The district court also found that people in the jail remain subject to serious harm arising from ongoing noncompliance with medical and mental health care provisions in the consent judgment and it found that these ongoing harms require and demand an expedient and complete remedy. These findings are firmly grounded in reams of record evidence including testimony given by the city's own witnesses and the city's own conduct. There is, as the district court found, there is no infirmary care at the current facility. There is no space for mental health care. There is no space to safely house people with acute mental illness. And the city agreed to build out facilities to temporarily fix only some of these issues. What's your response to their argument, brief and otherwise, about the declining census? The district court found that, and looking back at the January 2017 plan, the declining population was considered and there's a great bit of detail that then compliance director Maynard engaged in analyzing why the number of beds he recommends for Phase 3 would be adequate given the projected population decline. And the population decline that we have seen in the last six years has been consistent with those projections. What is the most recent estimate of the cost of Phase 3 for this? I believe the city had... Population of 89 special needs. I think it's 89. It's 89 beds is the current estimate. What's the most current estimated cost? I believe it's 51 million. 51? And how much of the, is it Templeton funds or whatever from FEMA? How much is that? I believe it's 70 million, Your Honor. 19 more than the cost of Phase 3? Yes, I believe. And those funds are committed to the present needs in New Orleans, aren't they? Yes, under paragraph D-22 of the stipulated order, those funds are committed to the exclusive use of implementing the plan developed by the compliance director. The parties have a plan for fixing the ongoing structural deficiencies that cause harm to people who are currently in the jail, and that plan is Phase 3. For these reasons, I respectfully request the court find in favor of plaintiffs' appellees and either dismiss this appeal for lack of jurisdiction or affirm the district court's ruling. Thank you very much. Thank you. All right, Mr. Woodruff. Good morning, Your Honors, and may it please the court. My name is Walter Woodruff, and I represent Sheriff Marlon Guzman. Your Honor, the City of New Orleans has done a masterful job of deflecting the true issues in this case and avoiding what this case is truly about, and it seems to me that there are two Trojan horses that are in court here today. One is the newly elected sheriff coming in as a party disguised as an amicus, and the other is that the city is pursuing what it says is an appeal of its Rule 60B motion or the denial thereof, and what it really wants is a redo of the agreement it made. The magistrate judge's 70-page report chronicles excellently, I think, the evolution of how this agreement came to be. It started with a consent judgment, had a stipulated order, and it had a supplemental compliance action plan that the city had a direct hand, Your Honors, in formulating. And not only did they commit to that, but what they committed was the basis, the consideration and cause, if you will, of what gave my client motivation to assent, and not only assent to that plan, but to relinquish his valid claim to maintain control of these $70 million. So that's a point that my opponent at times downplays or glosses over and at other times ignores, but my client gave up control of $70 million to make sure that this jail would get built, and he did so after the city made representations to the court in negotiating this, made representations to the court in the acceptance and the approval of the supplemental compliance action plan, and further, the multiple, multiple times that the city serially committed that not only did it still continue to accept the plan, but that it was taking actions and formulating the construction of this prison. It's only later that they abruptly do an about-face. And what this case is not about, Your Honors, this is not a referendum on penology. It's not a referendum on politics, and the district court saw that. The district court decided this case based upon sound legal principles, not politics. And the standard on reviewing a Rule 60B motion is abuse of discretion, and the city has to prove that the district court either erroneously viewed the law or clearly misapplied or misinterpreted the facts, and it's done neither in this case. The city made a promise, and now it seeks to slink out of it. The magistrate judge recommended that they not be allowed to do so. The district court accepted and adopted that recommendation, and we ask that this court make it unanimous. And if there are no further questions, I will just close with this that is a fact that is not known or has not been brought to light by my opponents, but it is in the record. Michael Gaffney testified that if these $70 million, these FEMA funds are not put to their dedicated use, they're lost. And this project has to be completed or substantially complete by August 29, 2023. Time is running out. The city has had its chance, and this is just the last in a long effort to avoid doing what it said it would do. This is really a matter of contract interpretation and contract enforcement. What's the record cite to the testimony about the funds will be lost? It's in the affidavit of Michael Gaffney. I can get it, Your Honor. That's right. What's the approximate date of that affidavit? It was submitted, I believe, on the hearing for the Rule 60B motion. Right. Hearing no questions, I will submit the matter and ask that the court affirm the denial of the city's Rule 60B motion. Thank you, Your Honor. Thank you, Mr. Wooder. We'll hear from Ms. Hecker. Good morning, Your Honors, and may it please the court, Elizabeth Hecker for the United States. I'm happy to answer any questions that the court may have this morning, but we'll focus on the city's failure to show that there are any changed circumstances that justify relief under Rule 60B. And then I'll just want to make a couple quick points about the PLRA as well after I do that. Your Honors, Rufo held that under the flexible standard applicable to modifications to consent orders in the institutional context, the party seeking modification must show that a significant change in facts or law warrants revision and that the proposed modification is suitably tailored to the changed circumstances. The district court here did not abuse its discretion in holding that the city has failed on both counts. In its motion, the city identified three purported changes in factual circumstances to justify relief. First, the city argued that it already is providing medical and mental health care above minimal constitutional standards. The district court called this argument disconnected from reality. Suicidal patients are still being housed in non-suicide resistant cells. The facility lacks programming space for individual and group therapy and it lacks an infirmary which the city's own medical witness testified is constitutionally required for a jail of OJC size. Second, the city argued that the COVID-19 pandemic was causing budget shortfalls that made building Phase 3 financially difficult. But any budgetary shortfalls caused by COVID-19 are irrelevant because the city is contractually obligated to build Phase 3 with previously identified FEMA funds. The city specifically agreed in the stipulated order, which it signed, to use those funds exclusively for three purposes. Youth housing, the DOCS facility, and housing detainees with serious mental health and medical needs. Give us the date. I've got a chronology here that would choke a horse. Give us the date of the stipulated order that the city signed you just referenced. Sure. It was June 2016. I'm not sure the exact date, but it was June 2016, Your Honor. Right. So after doing the first two things, the youth facility and the DOCS, the city has approximately $48 million left that it must use for housing these special needs detainees. And that amount takes care of almost all of the $51 million cost of this facility. Indeed, the city's federal grants manager testified that the city has $81 million left in FEMA money that it could use to build Phase 3. The district court also correctly rejected the city's argument with respect to operating costs. OPSO's chief of investigations testified that when Phase 3 is finished, the TDC staff that currently is caring for these detainees would be transferred to Phase 3. The TDC currently requires 102 staff, and Phase 3 is expected to be authorized for 109 plus 14 medical staff for the infirmary. That is not a substantial increase in operating costs. And in any case, these operating costs will not come to bear for a couple more years, by which time the city is expected to have recovered financially from the pandemic. Third, the city argued that a decrease in inmate population made Phase 3 unnecessary. This also is wrong. RUFO tells us that modification should not be granted where a party relies upon events that actually were anticipated at the time of the court's order. The court specifically found that this decrease in population was expected, and indeed that the recommendation for Phase 3 took the anticipated decrease into account. And importantly, the number of detainees needing acute mental health and medical care has not decreased, and that is from the testimony of both Dr. Rouse for the city and Dr. Patterson here. Finally, the district court did not abuse its discretion in finding that retrofitting the OJC's second floor was not an adequate alternative. Multiple witnesses testified that the mezzanine levels are simply too dangerous for detainees with tendencies towards self-harm. And again, the city's proposed retrofit lacks sufficient programming space for group or individual therapy. The city's proposal to convert two cells in the OJC to therapy rooms does not work because they lack the privacy necessary for honest exchange. Again, this is a specific factual finding made by the district court and is entitled to clear error review, as are all the factual findings here. And the group therapy rooms at the OJC building are insufficient because they don't consider the need for different kinds of therapy and different classification levels. Again, this is a finding of fact entitled to clear error review. And, of course, there is no infirmary in the city's proposal, and the evidence in the record simply does not support the city's assertion that it can simply rely on University Medical Center. The district court's factual findings on each of these issues were supported by the evidence and do not constitute clear error. The district court, therefore, did not abuse its discretion in rejecting the city's argument. I'd like very quickly, Your Honors, to address the city's statement that this PLRA issue is entitled to de novo review. That is incorrect. First of all, as Your Honors pointed out, the district court specifically found that the issue was waived. That finding of waiver is itself entitled to abuse of discretion review. This is not cited in the briefs, but it comes up in NRA's signal. This is a decision from the Fifth Circuit in, I believe, 2005. I don't believe anybody can designate standing for our court. We make that decision. Thank you, Your Honor. And also . . . You shouldn't be thanking me. I just don't believe because someone thinks that the district court waived something, that we're not bound by that. All right, Your Honor. Regardless of whether it is waived, this is simply not a proper decision, a proper argument to make in a Rule 60B motion. Rule 60B is for changes in circumstances and changes in law. The PLRA is certainly not a change in law. This law has been on books since 1994. There is no reason, as the district court found, that it could not have been brought up as early as 2017 when the SCAP was first issued. It certainly is simply not a purpose of a Rule 60B motion. And finally, Andy, one last point. With respect to the Home Rule Charter, it is black-letter law that city or state cannot use a state or local law to fail to abide by the orders of a federal order. This is North Carolina State Board of Education v. Swan, and Missouri v. Jenkins will hold that as well. Thank you. Thank you. Mr. Rosenberg, you've got five minutes. Thank you. A number of points. First of all, although counsel argued that there were adequate security officers to staff Phase 3 if it was built, that's just not true. The testimony is that there are only 60 correctional officers at the moment at a facility known as Temporary Detention Center, and you need at least 109, if not more. The monitor's report, year after year after year, each one of them, 14 of them, said there were inadequate security officers and there's no sign of improving that situation. Secondly, the health care of those inmates, if that is the issue that this Court's focused on, would be advanced by two years if the retrofit is used. That is uncontroverted in the testimony. Thirdly, there are multiple changes in the circumstances. We believe that, respectfully, it was error for the Court not to recognize these changes in circumstances, the decrease in jail population, COVID-19, the effect it had upon the city. Those changes in circumstances are unquestioned. Frankly, Your Honors, that, as the Court in Rufo said, the modification of the consent decree, if it needs to be modified, but really just the modification of those two orders, is flexible. The Court took a very stringent approach in considering our motion to modify. That's not what the Supreme Court has said in Rufo and in other cases. It is a flexible approach, and you look at those changes in circumstances to decide whether the motion to modify should be granted. Counsel opposite make arguments that the city's own witnesses in this voluminous matter somewhat belie the litigating position taken now. The record is what it is. We're going to read it all, but what's your take? Your Honor, as Judge Barksdale questioned me about, if the city agreed to the stipulation back in 2016, those circumstances have changed, number one. Number two, even if the circumstances had not changed and even if there was a specific commitment for phase three, which there was not, it's clear that under Ruiz v. Estelle that the Court cannot enforce a private agreement that violates the PLRA. This Court has said that very succinctly, very plainly, that you cannot have a private agreement that contravenes the PLRA, and that's exactly what these folks are trying to do is to enforce that violative agreement. There cannot be a waiver of the Court's rulings. I know, Judge Barksdale, you recognize that that is your province, the panel's province, but respectfully, this Court has prior rulings in Liljenburg and Bradley and others that we've cited in our brief stated that it is not a waiver for multiple reasons. We're aware of that. All right. I won't belabor that, Your Honor. I know you are, and I know you've read the briefs. The district court's order was clearly injunctive in nature. It doesn't have to be an injunction per se. It is injunctive in nature, and it told the city, this is what you must do as a mandatory injunction. The mayor, the council, all the council members, and I recognize the sheriff-elect is not the sworn sheriff for another five or six weeks, but all of those elected officials support a retrofit in lieu of phase three, which we believe is important for the court to consider. Incarceration simply is not the path to seek mental health, and we would ask this court for that reason to reverse the district court's ruling or remand it in lieu of, in view of the ruling of Ruiz v. U.S. when there's no analysis by the district court of compliance with the PLRA. Thank you, Your Honor. Mr. Rosenberg, I will only say you have been around the block a lot, and it is telling to me that in five minutes of rebuttal, you never addressed the money. You never addressed the $71 million in the FEMA. You never addressed the other money in the full five minutes, and both sides, I'm not, this isn't a question. It's a comment that's telling to me that in five minutes of rebuttal, you never responded to the availability of the FEMA money, questions that were asked, availability of the other money, nor the 60B standard, et cetera, but back to Ruiz and so on and so forth. So I'm just, that's speaking only for myself. No reply is warranted, needed, or allowed. Just a comment. This is rebuttal. All right. That concludes the arguments for today. Heavy duty. I know you went down there.